Hear ye, hear ye. This Honorable Appellate Court for the 2nd District is now open. The Honorable Justice Robert D. McLaren presiding, along with Justice Susan F. Hutchinson and Justice Anne B. Jorgensen. The case is No. 219-0403, Nancy E. Plass, Plaintiff Appellant v. Johnson and Johnson Surgical Vision, Inc., et al., Defendant's Appellees. Arguing for the Appellant, Michael W. Rasek. Arguing for the Appellees, Nicole C. Henning. Mr. Rasek, you may proceed. Good morning, and thank you, Michael Rasek, on behalf of the Plaintiff Appellant, Nancy Plass. As the Court, I'm sure, is aware of this is the case in which Nancy Plass went to Dr. Tilton to have a lens inserted in her eye, and the doctor used an injector that was given to him by Johnson and Johnson's sales representative. The representative told Dr. Tilton it was a good injector, FDA approved. It was not, and of course, when it was used, it failed and injured her eye. The Circuit Court dismissed the three counts against Johnson and Johnson, and I just will proceed through the three counts. Just almost from Morris' background, I'm aware that the Court out here has always read the briefs and is familiar with the facts. The first count had to do with the voluntary undertaking charge, and in that case, Mr. Arciero's conduct met the requirements of Section 324 of the restatement. He rendered services to Dr. Tilton. He knew the services were going to involve the care of Nancy Plass, and because Dr. Tilton reasonably relied upon the sales representative in using this experimental device, Dr. Tilton proceeded to use that device rather than a safe device and injured her. The second charge was under Section 311, negligent misrepresentation. Again, the same theory. Arciero told Tilton it was FDA approved, it was good, it was being used commercially, and he knew Dr. Tilton would rely upon him. That's the allegation of the complaint. In this case, of course, it's before the Court, solely on the dismissal of the three counts of the complaint under 2615. And as a result of the use, of course, the injector injured Nancy Plass' eye. And the third and final count is under Restatement 876, where Mr. Arciero knew that Tilton's use of the device would breach a duty because Arciero knew the device had not been approved. And he, of course, gave substantial assistance or encouragement, actually both, to Dr. Tilton because he told him it would work and encouraged him to use it and, in fact, loaded the device, the injector, with the lens and the cartridge in the operating room. It stood right there and watched Dr. Tilton use the injector to insert the lens into Nancy Plass. The only defense, really, to each of the three counts is this contention that the learned intermediary doctrine applies. And that, of course, is under Kirk, which applies to a situation where you have a doctor prescribing either a medication or using a medical device. And Kirk held that it's up to the doctor to explain the shortcomings or the problems with the device or the medication to the patient. In this case, we don't have a medical product. This was an experimental device. It was not to be used. It was not a question of a doctor-patient discussion or relationship. It was a question of whether Mr. Arciero affirmatively and actively interfered with the patient-doctor relationship between Dr. Tilton and his patient, Nancy Plass. And that's what he did when he gave them a device that wouldn't work. That case, rather this case, brings us more under Happel, the case where the Wall Street or Walmart druggist prescribed a medication when he knew that the patient should not have the medication because of allergies. And the court said in that situation, just like in this case, the person with the most knowledge about the problem was the druggist, and here the person with the most knowledge was Arciero. He's the only one in that room, in the operating room, who knew that the device he just gave to Tilton would not work and was going to injure somebody. Under all three of those theories, the plaintiff set the facts up in her complaint that should allow her to recover. And I'm really, at this point, open to questions from the court. That's the summary of our argument. Thank you. Justice Bridges, do you have any questions? I'm sorry, not Justice Bridges. Justice Jorgensen. Sorry about that. We're a different panel earlier this evening. Right. My concern with your theory is that the sales rep from Johnson & Johnson does not represent, nor sell, nor manufacture the injector. They manufacture the lenses. How do we build a bridge from a different manufacturer to this sales representative? The bridge doesn't come from the manufacturer. The bridge runs directly from Arciero to Tilton to Plass. Starting with the fact this isn't a product. It's not something that somebody was selling, and that's the key here, I believe. I was going to say the manufacturer of this product, but it's not a product. It never got to that stage. This is the same as if I stepped out into my backyard and I gave my neighbor a ladder that I purchased someplace, and I told the individual that I've used this ladder, it's fine, and my neighbor gives it to his son and his son's injured, I'm going to be responsible for making that representation to that neighbor for the injury to his son, regardless of who manufactured it. The bridge between the manufacturer, I keep using the word manufacturer. It's not really a manufacturer. In this case, the bridge between the entity that was creating the product is a separate bridge. That's a separate case. I'm not sure I've answered your question, but I think that's the distinction here. All right. So it doesn't matter that the sales rep has no connection with the company that allegedly made this? Not at all. It should be entirely immaterial to the question we have here. The real question is, did Arciero misrepresent something? The product that he misrepresented is irrelevant to the fact that he made the misrepresentation. Those are two separate sets of conduct. Even if the product was a product that had been marketed, nonetheless, it still falls back on somebody who made a misrepresentation to the doctor. The learned intermediary doctrine is intended to not cause the manufacturer to interfere in the patient-doctor relationship. This situation is the other side of that coin. Arciero did interfere, and that's the difference. He took affirmative conduct by making this representation and by giving him the device. I have no other questions. Thank you. Thank you. Justice Hutchinson, do you have any questions? Yes, I do. Thank you. Counsel, your complaint, I think, says that Arciero said it was on the market. I think it's Dr. Tilton's complaint that says that Arciero said it was FDA approved, correct? Yes. Our complaint says both, that Arciero represented to Tilton it was FDA approved, it was on the market, and it was being used by other physicians. Okay. What does on the market mean in terms of medical language? On the market would mean that it was being, I think, the same. It's actually redundant from it being used. He represented to Dr. Tilton that this was a device that was commercially available when that was not the case, that other physicians were actually using it. That's what was intended, and I think that's what most people would draw from the complaint. And the reason he did that was to cause Tilton to rely upon it. If he had told Dr. Tilton, here's an experimental device, he knew Tilton would not use it. By saying everybody's using it, Tilton would rely upon it because we alleged in the complaint that doctors frequently rely upon manufacturer's representatives for information about devices. And your complaint also indicates that Arciero was in the operating theater during this procedure? Absolutely. The complaint says that immediately before the procedure, Arciero made the representations. I just mentioned to Tilton that he went into the operating room with them, assisted the nurses, as he had done before, loaded the device, and gave it to Tilton for use, thus establishing he was not, as Johnson & Johnson alleged in its answer, a silent bystander. He was affirmatively involved at every step of the way. I don't know that that's critical. As soon as he makes the misrepresentation, he has crossed the bridge and done something improper. Here, he just continued to be involved, and I think that probably is what hooks in concert liability as well, because he continued to be part of the process. Doesn't your complaint just allege that he supervised the loading? I didn't find anything that indicated he was hands-on with the loading. I believe the complaint alleges that he actually loaded the device. I would admittedly have to look at it very closely, but I thought that he was, in fact, the one who actually loaded the device. The trial judge just basically said that the dismissal was on the basis of learned intermediary, correct? Correct. The trial judge, as I understand his statements, he accepted almost everything I just told the court and simply said to learn it. He applied Kennedy. The Kennedy case. All right, but in Kennedy, didn't the doctor have what might be considered adequate, correct information, and a person who could actually administer, you know, knew was a professional in the area? Wasn't it a nurse of some nature? What happened in Kennedy, what makes it so different in this case? In that case, they were inserting a pacemaker, and the manufacturer's representative was present during the surgery, and the role of the manufacturer's representative was once the surgeon had inserted the leads, then the representative was to see if it worked. But as the appellate court there said, the representative was not involved in inserting the leads, did not tell the doctor how to insert the leads, and had no way of knowing whether he had done it correctly or not. And therefore, the appellate court said the rep was not involved. The other thing is that the issue in the Kennedy case was where the venue was, the facts in that case, not the allegations of the complaint, which is what the Johnson & Johnson said to the trial court judge incorrectly. It was there on summary judgment. And the facts in the complaint were that the problem was that when a problem resulted, they weren't in the venue where they could assist the patient, and the manufacturer's representative, even though she was in the room and had nothing to do with inserting the leads, had no say in the venue. So there was no connection at all, completely separate from RCRO's affirmative conduct here. But in our case now, you've already indicated that, in fact, Dr. Tilton did not have correct information, correct? That's correct. So how could learned intermediary apply? It does not. That's my point. The learned intermediary doctrine cannot apply here. The person in the room with the correct information was RCRO, and he had a duty under Apple to tell somebody that information, either Tilton or the plaintiff. He couldn't tell the plaintiff because she was under sedation, presumably. And that's what voluntary undertaking and negligent misrepresentation all come down to. RCRO told Tilton it would work, and that was wrong, and he injured the patient. Okay. I don't have any other questions at this time. Thank you, counsel. Thank you. I don't have any questions. Ann, do you have any questions? No follow-up. Thank you. Okay. Thank you. Thank you. You will have an opportunity to make rebuttals, sir. Thank you. Ms. Henning, you may proceed. Thank you, Your Honors. May it please the Court. The theories of liability that plaintiff is pressing in this case are unprecedented, and they're unprecedented for a reason. A holding in plaintiff's favor of this case would radically expand liability in Illinois and do so in conflict with existing case law. This Court shouldn't expand Illinois law in the manner plaintiff requests. Before we begin, I think it's helpful to provide some context to what's actually at issue here. By plaintiff's own admission, she does not bring a failure to warn claim or a strict liability claim against the JJSVI defendants. Both of those avenues of relief are available with respect to a SECO, the manufacturer of the device that's alleged to have injured plaintiff. And, in fact, the complaints at issue in the case allege those counts against the SECO, and plaintiff has now settled them. She also continues to pursue her claim against Dr. Tilton and his employer. She's decidedly not without recourse here, but I'd like to discuss each of the three claims she brings against the JJSVI defendants or the third group of defendants she seeks to hold viable here. I'd like to start with the negligence claim, Count 3 of the Seventh Amended Complaint, because I think it's useful to frame the issues. Before today, I understood plaintiffs to be arguing that JJSVI violated some general duty of care through alleged misstatements to fill our CRO, and that this was not a negligent misrepresentation claim. Counsel, in opening, characterized this as negligent misrepresentation claim, so I think we're now in agreement. This is a negligent misrepresentation claim, regardless of what label is put on it. One element of negligent misrepresentation under Illinois law is plaintiff's own justifiable reliance. Plaintiff's counsel has previously conceded that, if you look in the record at C-2239, and her complaint establishes that she can't meet that element here because there was no discussion between herself and Dr. Tilton between the meeting with Mr. Arciero and surgery. There's no way an alleged misrepresentation could have reached her. Plaintiff argues that she can avoid personal reliance and rely on Dr. Tilton's reliance through Restatement 311, but Restatement 311 is not the law of Illinois, and the ACNS case was very clear about what needed to be shown to state a negligent misrepresentation claim, and that was reliance of the plaintiff. It states that when it generically states the elements of negligent misrepresentation on page 452, and it also reemphasizes that later when it discusses the, quote, significant hurdles, end quote, that it believes the school will have to prove its own reliance on remand. And in fact, this court's Village of Vinsonville case emphasizes that this reliance aspect of 311 was not adopted by the Supreme Court in footnote 12 of that case. Plaintiff can't point to a single case in which negligent misrepresentation was also allowed to proceed based on third-person reliance, and there's a good reason not to do that. Courts studiously avoid creating liability to the world from a misstatement. That would create nearly boundless liability for many run-of-the-mill, everyday statements, chill speech, burden the court system with difficult-to-defend claims about statements purportedly made to others at some time in the past. In fact, justifiable reliance has been called the sin qua non of a negligent misrepresentation claim in the Doe v. Dillon case cited in our brief, and that case explained that the reason for that is otherwise parties could risk shift based on misrepresentations when they actually have it within their ability to determine whether a particular statement is true or false. So it has to be a plaintiff's reliance, and it has to be justifiable. That element set forth in the Connick and ACNS case from the Supreme Court and appellate court cases like Prime, Leasing, and Simmons, all of which are cited in our brief. So that takes us to the voluntary undertaking case. And to me, this is best resolved by asking oneself, what exactly is the undertaking here, the thing necessary for the protection of plaintiffs? It seems plaintiffs are arguing that it's either bringing the device to the doctor, serving as a sales representative, or making statements regarding the device. But none of those things are actually required, necessary, to protect a patient, which is what voluntary undertaking entails. And in any event, if any of those were enough to create an undertaking sufficient to give rise to a duty running directly to plaintiffs, then the learned intermediary doctrine is effectively dead in Illinois. Many pharmaceutical or device representatives bring products to physicians. They bring samples. They bring special order devices. In fact, in Kennedy, part of the claim was that the representative shouldn't have brought the device to the doctor. And all serve as sales representatives and make representations to physicians regarding their company's product. The learned intermediary was designed to protect the doctor-patient relationship and is critical for that purpose in Illinois. The law doesn't want to encourage, let alone require to prevent liability, sales representatives to intervene in a physician's treatment of his or her patient, or worse, refuse to provide products that doctors deem necessary for their patients for fear that their companies might later be held liable if the doctor's judgment is incorrect. This logic is set forth in Kennedy quite well. It's also in Kirk and other cases. So including misrepresentation as an undertaking also has the added problem of bringing forth all the problems associated with And as for being present in surgery, Your Honor was correct that it actually alleges he supervised the loading of the injector. That's count three, paragraph 42, if you want to take a look at it. And it also alleges that he was present in the operating room as he had been on prior occasions for the purpose of assisting the charge nurse. So I just want to make clear, nowhere is it alleged that he actually assisted anyone other than supervising the loading of the cartridge. And that is supervising with respect to the lens, which is not alleged to have malfunctioned. The Kennedy and the Millman case, both cited on page 13 of the 0403 brief, involve someone present at surgery and show the court imposing no duty to interfere with treatment, understandably because you don't want to incentivize interfering with surgery as it's ongoing. So that brings us to in concert liability, which without an underlying tort, you know, is a tough road to hoe. That eliminates A and C subsections all on its own. But should the court choose to evaluate further, it's worth pointing out that the complaint does not allege anywhere that using the device on a patient, on Mrs. Plass in general, in a surgery was Arciero's idea, that Arciero actually stated that that should happen. That is not alleged. And, you know, it never says Arciero said, let's go do this. You can look through the allegations. It's not there. Subsection A, with that background, fails because at best what the complaint alleges is that Arciero made some statements. Plaintiff alleges those statements were false. And then Tilton embarked on his own plan. Nowhere does it allege that use of the injector was somehow a joint activity. The closest it gets is that supervised loading of the lens language. And so that deletes A as a potential source of liability because the action has to be in concert and of common design to satisfy A. It doesn't satisfy B either. Substantial assistance and encouragement, as the Norman case makes clear, require an active role in the tort. Merely providing the tools to commit the tort is not enough. And the case really here rests on the assumption that because Arciero was present at surgery, he substantially assisted in the surgery. But Kennedy, in Kennedy, the representative had a much greater role in surgery, and the court found no duty arising from that. And, again, that's not the sort of active role envisioned by the Norman court. So that leaves us with the alleged misstatements themselves and whether that can constitute encouragement. Again, there's no allegation that Arciero actually said out loud, we should use this on a patient or we should use this on Mrs. Plath. But even if he had, even if that were alleged, plaintiffs cannot cite a single case where someone's mere words were sufficient to constitute encouragement to support liability as in concert liability. Indeed, in Norman, there was no dispute for the idea that the car trip that was at issue in the case was defendant's idea, yet the court found no in concert liability. And subsection C fails again because there was no substantial assistance and no separate tortious conduct. And I'd just like to close briefly on this by saying that under plaintiff's own theory of the case, this is extremely odd in concert liability indeed, because under plaintiff's theory of the case, Dr. Tilton's actions were only taken because he was deceived into it. I don't know of a single conspiracy-like plan where one party had to be deceived into participating by the other. So their own allegations undermine this theory. So for all of these reasons, the JJSCI defendants ask the court to affirm the judgments below. Thank you. Justice Jorgensen, do you have any questions? I do. Explain to me why the voluntary undertaking is inappropriate here. Sure. It's inappropriate in part because what are alleged as the undertakings are things that device sales representatives and drug sales representatives do every day, bring a device to an office, discuss said device. The whole purpose, the fact that what was said was allegedly false is no different from every single failure to warn claim in the world, Your Honor. So the very logic of the learned intermediary doctrine, which is you can't have people concerned about liability when they're to the patient directly, when they're speaking to the doctor, the doctor needs to be the one that is relaying the information. And we don't want representatives running in and actively interfering with patient doctor treatment applies here. But moreover, none of the things that I just described are necessary to protect a patient, which is what the standard actually requires. So is it also somewhat your position that if we were to adopt this, this would dramatically change the process by which physicians are acquainted with or have opportunities to try new devices, new medications, et cetera? I think so. And that's why the courts have been so careful with the learned intermediary doctrine, because they don't want to create a situation where sales representatives are encouraged by the law to go in and second guess doctor treatment decisions and interfere affirmatively with doctor treatment or doctor discussions with patients in order to avoid their own liability, because that creates real problems both for those who are selling the medically necessary products that we all use and for physicians and for patients. It's just something that we don't want to introduce to the system. And that's sort of the necessary consequence of the holding that plaintiff seeks here, because essentially what the court would have to say is that if you give incorrect information to a doctor about your product, you have a duty running straight to the plaintiff and that the courts have been very careful to avoid that consequence. Is there a difference here between a failure to warn versus an affirmative misrepresentation? So admittedly, I do think the learned intermediary doctrines are developed in the context of failure to warn claims. I think the same logic, though, like the very same reasons why it has been used in the failure to warn claim is applicable here. So the answer is, yes, it is a different claim, but the reasons and the logic and the consequences point in the exact same direction. That was my question. Nothing else. Thank you. Thank you. Justice Hutchinson, do you have any questions? Yes. Thank you, Justice McLaren. Counsel, I know that you are representing the Johnson & Johnson offspring or whatever it's actually called today. And I would say you're doing a good job. But there is a injured party here who doesn't seem to play into this, into your idea of this case at all. What do we you know, how do we provide for this injured party? As I noted in the outset of the argument, Your Honor, she is not a party without recourse. She has at least two other groups of defendants and in fact has settled with one group of defendants. And so you're correct that my argument doesn't hinge on the fact of whether or not plaintiff was injured. But honestly, Your Honor, my argument in my mind, I'm thinking about a lot of other people who aren't plaintiffs who could be injured by the wrong holding in this case. And by requiring drug representatives and device representatives to affirmatively interfere with plaintiff treatment. Not only that, the unbounded liability that could result if you say that with no personal reliance, let alone justifiable reliance, that one can be held liable for a statement made to a third party. That would injure a lot of people in a variety of ways that I mentioned during my argument, including but not limited to First Amendment rights, which are extremely serious. Well, but all right. The trial judge made in the intermediary decision, a learned intermediary decision and said, I'm dismissing it on this basis. It didn't talk about some of the other issues that have been raised here today. The learned intermediary is not learned just because he or she is a doctor. It's because he or she relies upon reliable, accurate information. What was reliable or accurate about anything that was said? Well, Your Honor, based on the allegations of the complaint, which I have to accept for purposes of this argument, the statements were false. But again, that is true of every single case based on a sales representative's statements. I will add that in a device, it's extremely easy to verify reliable information because you go to the FDA website. You see whether it's approved. You see the label. These things are all very publicly available and doctors know where to find them. So it's not as if doctors are babes in the woods and have to blindly trust whatever they're told. And honestly, I think that's a justifiable reliance problem for plaintiffs as well, even if there is some kind of third party reliance, which again, don't think there should be. So I guess I would say for the purposes of this case, I agree with you that we have to accept that what Mr. Arciero said was not true. But I disagree with the premise that doctors don't have a method of learning accurate information. They absolutely do. So are you saying that in this case, Arciero's representations had nothing to do with Dr. Tilton using this device? That is certainly, I guess I wouldn't say nothing to do because that's not alleged one way or the other. But what it says is Arciero made certain representations and then Dr. Tilton used the device. It doesn't say Arciero asked or noted that this device should be used on Mrs. Plass. That's not an allegation in the complaint, certainly not in the immediate future. And so whether it had absolutely nothing to do with it, I guess based on the allegations of the complaint, you can't necessarily say that. But what I will say is that it doesn't allege that this was some kind of common scheme on the part of Arciero and Dr. Tilton. But Arciero is standing in the operating theater with this device, with the doctor, and he's supervising the loading of the device. What does the doctor do at this point? It's called timeout. Mrs. Plass, you just stay there because in this type of surgery, usually they're not totally under anesthesia. But you just stay there. I'm going to go check on my computer. Is that what's supposed to happen? I'm not sure I completely understand your question, Your Honor, but what I think I understand you to say is sort of bringing me to my own point, which is necessarily what plaintiff is saying should have happened here is that when Mr. Arciero was in the operating room, not doing anything with respect to the injector, just supervising, not loading himself, supervising the loading of his own lens, he should have woken plaintiff up and said, hey, I got something to tell you. Or he should have said, you know what, I'm taking this device away from you. I'm taking this treatment option away. I don't want you to have it. And those things, if that's the court's holding, are going to have very bad consequences for patients in Illinois. It's going to encourage device representatives to interfere with doctor-patient relationships, and it's going to encourage them to not provide devices where there's a question of medical judgment. And neither of those are desirable. So by the same token, if I take this argument that you've just made, if we decide in your favor here on this learned intermediary doctrine and have facts that are truly misrepresented, we are now encouraging manufacturers, reps, or others to continue to do this damage to people by misrepresenting the safety or status of devices, medication, or whatever they're pitching. I disagree with that, Your Honor, and here's why. Because manufacturers are still liable for strict liability. They're still liable for failure to warn. They still have FDA consequences to deal with. They have all kinds of mechanisms built into the system already to discourage them from making false representations about their own products. The question is, in this non-manufacturer situation, is there a claim where there's no personal reliance by the plaintiff? And the answer is no. Short of waking the plaintiff up, which would be after knee surgery eight weeks ago, if somebody woke me up and said, excuse me, we're going to go check on something, or I've suggested this, and I don't know that face, what exactly am I supposed to do? How can I let him misrepresent these facts and cause this injury? Well, Your Honor, you would have recourse against the manufacturer and the doctor. Well, who's the manufacturer here? In this case, it's SECO. Who is related to whom, or what? Irma de la O, who is also there, and also made the same alleged misrepresentations, and who there has been a settlement with that company. Okay. So Johnson & Johnson is only there, or your JJ, and I can't get all the letters, I apologize, is only there on the part of the lens? Correct. All right. All right, Justice McClaren, I have no further questions, and thank you, counsel. Thank you. Ms. Henning, am I correct in believing that the learned intermediary doctrine is a concept that relates to granting immunity to manufacturers because of the placement of a learned intermediary between the final consumer and the manufacturer? I wouldn't say grants immunity. I would say it makes the duty to disclose in a failure-to-warn case to the doctor. So it's discussed in terms of duty, not immunity, but I would say that it's a doctrine about the duty that a device manufacturer owes that's designed in part to protect the patient-client relationship. So you're saying that a manufacturer… I'm sorry, patient-doctor relationship. I'm sorry. You're saying if there's an intermediary, then it doesn't make any difference what the manufacturer says. The positioning of an expert precludes the necessity for a manufacturer to warn the consumer that they're going to be operated or treated with a time bomb. So it concerns the level of education of the intermediary, and it requires…it basically says we want the judgment of the doctor to govern. Does that answer your question? I'm sorry. I'm not sure I fully understood your question. It seems to me what you have been saying during this oral argument is that the fact that there is an intermediary who may be learned, but isn't learned about this particular widget that your client has manufactured, acts as a disconnect between any duty that your client has to warn the consumer that there is something wrong with your widget. Okay. So I think that you're getting a little bit confused. First of all, my client was not the manufacturer of the product. Second of all, this is not a failure to warn claim. So I want to be clear. The manufacturer, who is a SECO, does in fact have a duty to warn the doctor. And if that warning is incomplete and the doctor relies on an incomplete warning, the patient has a cause of action against the manufacturer. However, the law is very clear that that duty rests with the manufacturer only for any variety of reasons. That's not Johnson & Johnson here. What is Johnson & Johnson here? A third party whose lenses work in conjunction with…so it's a manufacturer of a different product that's related to the product that allegedly malfunctioned. Then what was the information that was given to the doctor regarding what was FDA approved? Was your agent giving misinformation about the instrument that was made by SECO? Yes, he's alleged to have done so. He's alleged to have said it was FDA approved and it was not. Incidentally, a SECO's representative is alleged to have said the same thing. Okay. I have no further questions. Any other questions by the panel? Yes, I have one, please. Counsel, this device, however, made by a SECO specifically was able to use the Johnson & Johnson lens, correct? That was the representation? Correct. The lens could be used with the injector, correct. And it could be used with one hand, so the doctor had the other hand free to position the lens where he or she wanted it, correct? That is the allegation in the complaint about the injector, yes. And finally, there is some relationship between your client and Johnson & Johnson, correct? My client is Johnson & Johnson, Your Honor. A SECO is the manufacturer of the injector. And Mr. Arciero works not for the injector company, that was the lady that was there, but he works for Johnson & Johnson? The lens manufacturer, correct. Okay, thank you. I do have a follow-up question. The lenses that are manufactured by Johnson & Johnson, are they specific only to the device at issue here that was manufactured by the other company? No, Your Honor. Okay, thank you. I have no further questions. Thank you, Ms. Henning. Thank you. Mr. Ratsek, you may have a rebuttal. Thank you. With regard to that very last comment, the reason that Johnson & Johnson was attempting to have a SECO design this lens injector was because, and it's alleged in the complaint, other companies' injectors could not work with Johnson & Johnson lenses, so Johnson & Johnson was losing sales. So the answer, yes, lens that was in that room could only be inserted with this kind of an injector. Going back, the claim was that a SECO had a duty to warn Dr. Tilton or the patient rather than Johnson. The problem with that is a SECO didn't have any duty to warn anybody because it didn't have a product. A SECO had no intention of having this device out there being used. So why would a SECO ever want to protect anybody, to warn anybody? The only person that knew all of the ingredients for this pending disaster was Arciero. And as, I'm sorry, one of your honors said, the intermediary can do no better than what is given to them. And in this case, the learned intermediary, Dr. Tilton, could only work with the information that Arciero had just given him. And moving slightly, by the way, Arciero supervised. He did not actually load the injector. I'm sorry, I got confused with what I read in the depositions with what's alleged in the complaint. The bottom line here is that the argument is that the learned intermediary doctrine and policy is to not set up a situation where manufacturer's representatives interfere with medical care. Johnson's problem here, and the problem they're going to have before the jury, is that they did interfere. They actively and affirmatively interfered by telling Dr. Tilton, knowing Dr. Tilton would rely upon his information, that this was a good injector, that it would work, and stood by while he used it on Nancy Plass. And finally, the suggestion that Nancy Plass had to personally rely upon it was rejected by this district in the Village of Bensonville case, which is at page 9 of our reply brief. Very specifically rejected the idea that the person who was injured has to be the one who actually relied. Unless the court has further questions for me, that concludes my argument. Justice Jorgensen, do you have any questions? Yeah, I just want to be clear here. So it's your position that the Johnson & Johnson lenses could only be used in this particular device? Yes. That's why I was trying to modify or structure my answer. The problem was that Johnson & Johnson lenses can be used with other devices, but the other devices are such that the doctor has to use both hands on the device. And the problem was that the doctors did not want to use those devices. They wanted to use this kind of a device, which left one hand free. So the Johnson & Johnson lenses could not be inserted with the other devices. If it was going to be used with an injector that could be used with one hand, it had to be this injector. All right. And is it also your position that the Iosco injector, this device, was never intended to be marketed? Absolutely. That's exactly what we tried to tell the trial court judge over and over. This was an experimental device, a prototype device. When it finally left the laboratory with testing and FDA approval and everything else that goes with it, it would have presumably been, actually I think we alleged that it would be sold by Johnson or with Johnson's name on it. But at this point, it was simply a step in the direction. It never should have been given to anybody. It wasn't supposed to be used on a patient. We did sue a CEQA. We sued a number of people. That's not relevant to what Johnson & Johnson had a duty to do here, however, despite the suggestion to the contrary. The bottom line is a CEQA did not want this to be used with anybody. They weren't going to warn anybody because why would I give a warning to somebody not to use something when I never wanted them to use it in the first place and I had no idea that they actually had it. If somebody takes my product and gives it to somebody else, there's no ability for me to warn somebody. It's not something that's even in my universe of possibilities. The only person that knew what was going on here was Johnson's representative, Arciero. The other company's representative knew what was going on, too. That's one of the allegations of the complaint. That's a separate question. It's going to be a question here, as I said in the brief. It's a question of which side the jury is going to believe. I gather Mr. Arciero is going to blame the other people. Dr. Tilton has pointed the finger squarely at Johnson & Johnson. If somebody else is or is not liable, that should not have anything to do with this person's liability. The fact that somebody else contributes to cause the accident doesn't mean that I'm off the hook if I was one of the people, obviously. I have nothing else, then. Thank you. Thank you. Justice Hutchinson, do you have any other questions? Yes, I do. I think there was, as I recall, some representation by Mr. Arciero that this device had been successfully used by others. Is there any evidence in the record that it had been used by any others? No, because we're at the complaint stage. We had no ability to put any evidence in. All we were dealing with were the allegations of the complaint. That's a step that would have to be down the road once we got into discovery. We actually have the discovery, but I can't go there now because all we're dealing with is the complaint. That's correct. Is the allegation in the complaint that if this device had actually gone through the testing and been FDA approved, it might have been marketed by Johnson, or is that something you found out subsequently? I believe that's in one of the iterations of the complaint, that it would have eventually been marketed either by Johnson or with Johnson's name on it in some fashion, so it was associated with Johnson. I don't know. Frankly, I don't know. What could happen with it down the road if this experimental device actually proceeded to manufacture should not, I believe, affect the duty that Johnson had not to make a misrepresentation, not to actively interfere with this doctor and give the doctor the wrong information. All right. I don't have any other questions. Thank you, counsel, and it's all yours, Justice McLaren. What is your understanding of the Learned Intermediary Doctrine insofar as whether or not it creates liability, it immunizes from liability? What exactly is the public policy that is supposed to be reinforced or supported by this doctrine? Well, the Supreme Court in Kirk viewed it as, I think, a policy decision on the grounds that the person with the most knowledge of the product or the drug is the one that we're going to put the duty on to talk to the patient. In Kirk, that was the doctor, but the Supreme Court in the Walmart or Walgreens, rather, prescription case, expand is not the right word, explored the doctrine a little bit more, and they said in that case, the doctor prescribed the prescription, and the Walmart druggist or Walgreens, whichever druggist filled it, they still put the duty in that case on the, that's the equivalent of the manufacturer, the person giving the drug out, not the doctor, to correct the situation, because in that case, Walmart and its druggist had the most knowledge about the problem. And that same policy argument is present when we're talking about a sales rep using a demonstrative prototype and making representations. Only the rep knows that it's wrong. A CEQA didn't know it was even being used. Would it be safe to say that you disagree with Ms. Henning's interpretation of the doctrine insofar as you disagree with the concept that this doctrine applies even when the information that is given is either incorrect or an actual misrepresentation? Absolutely. I hope it came through. That is our whole point. Once you actively insert yourself into the relationship by basically lying to the doctor because that's what occurred here, the whole policy underlying the learned intermediary doctrine disappears. That's why we have voluntary undertaking and that's why we have negligent misrepresentation. There's no exception in Section 311 for cases that somehow involve medical care, nor does there need to be. I have no further questions. Does the panel have any other questions? No, thank you. Anne? No, I'm sorry. No, I do not. Okay, thank you. Oral argument is complete. I'd ask the clerk to close out the recording and terminate the connection. Thank you. Thank you, Your Honor. Thank you.